IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

APRIL SESSION, 1998

FILED

August 12, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9704-CR-00158 |
| | ) | |
| Appellee, | ) | |
| | ) | DAVIDSON COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. THOMAS H. SHRIVER, JUDGE |
| JAMES C. NICHOLS, | ) | |
| | ) | |
| Appellant. | ) | (FIRST DEGREE MURDER) |

FOR THE APPELLANT:

**KARL DEAN**
District Public Defender

**JEFFREY A. DeVASHER**
Assistant Public Defender
(On Appeal)

**ROBERT M. ROBINSON**
**MARY GRIFFIN**
Assistant Public Defenders
1202 Stahlman Building
Nashville, TN  37201
(At Trial)

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**TIMOTHY F. BEHAN**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN  37243

**VICTOR S. JOHNSON, III**
District Attorney General

**NICHOLAS D. BAILEY**
Assistant District Attorney General
Washington Square
222 Second Avenue North, Suite 500
Nashville, TN  37201-1649

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# **OPINION**

The Defendant, James C. Nichols, appeals as of right from his conviction in the Davidson County Criminal Court. Following a jury trial, the Defendant was convicted of first degree murder and was sentenced as a career offender to serve a life sentence in the Tennessee Department of Correction. In this appeal, the Defendant argues the following issues:

> 1) Whether the trial court erred in denying the Defendant's motion to suppress statements made to the police;
>
> 2) Whether the evidence was insufficient to support the Defendant's conviction for first degree murder;
>
> 3) Whether the trial court erred in allowing the admission of prior threats by the Defendant against the victim during the State's case-in-chief; and
>
> 4) Whether the trial court erred in denying the Defendant's motions (a) for an amended instruction on the range of punishment and (b) to strike the portion of the range of punishment instruction which advises the jury of the minimum length of time Defendant would serve prior to parole eligibility.

We affirm the judgment of the trial court.

## I. MOTION TO SUPPRESS STATEMENTS

The Defendant gave several statements to both arresting and investigating officers on the day of the stabbing, September 24, 1994, and the following day, September 25, 1994. These statements were made both spontaneously prior to arrest and after Defendant had been arrested. Defendant claims that he was so intoxicated while making the statements made on September 24, 1994, that he did

not voluntarily or knowingly waive his rights as according to Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Before a Defendant can knowingly and voluntarily waive his Miranda rights, the Defendant must be "adequately and effectively apprised of his rights." State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992)(citations omitted). If the waiver is made "voluntarily, knowingly and intelligently "then a Defendant may waive his rights. Miranda, 384 U.S. at 444; 86 S. Ct. at 1612. The burden of proving the waiver by a preponderance of the evidence at the hearing on the motion to suppress is on the State. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a Defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. Middlebrooks, 840 S.W.2d at 326. Recently, in State v. Odom, 928 S.W.2d 18 (Tenn. 1996), the supreme court held as follows:

> The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Odom, 928 S.W.2d at 23.

Officer David Howard testified at the suppression hearing that when he arrived on the scene of the stabbing he entered the Defendant's home and called to the Defendant. The house was dark and Officer Howard was using a flashlight to approach the Defendant in the back of the house. As Howard approached, the Defendant kept repeating that "[he] stabbed her." Howard had not directed any questions towards the Defendant at that time. After Defendant made the

incriminating statements, Howard handcuffed him and read him his Miranda rights as he was arrested. Defendant indicated that he understood those rights and that he did not want a lawyer. Nearly forty (40) minutes later after the other detectives arrived, the Defendant was sitting in the back of the police car when he stated, "I just jammed the knife in her ass as far as I could." Howard described the Defendant as being in a jovial mood. While Howard thought Defendant had been drinking as he noticed the odor of alcohol, the Defendant seemed lucid in his comments and there was nothing that indicated his level of intoxication caused him to be unable or incompetent to understand his rights.

Officer David Imhoff arrived at the scene of the stabbing after the Defendant had already been arrested and advised of his Miranda rights. Defendant was placed in the back of Imhoff's patrol car while Imhoff received information from him to fill out an arrest report. While Imhoff did not ask Defendant any questions relating to the stabbing, the Defendant blurted out that "[I] stabbed that goddamn son of a bitch. She tried to cut me and I took up for myself. I took the knife from her and stuck it up her ass. I made a mistake. I did it. I'd die if it were fatal, but she is a fat old bitch."

Investigator Scott Billingsby arrived while the Defendant was still on the scene. Billingsby determined that Defendant had previously been advised of his Miranda rights by Officer Howard. Defendant was transported to the rear of Billingsby's patrol car. The first statements Defendant made were, "Blow my goddamn brains out. I cut her. I stuck a knife in her." From that point on, Billingsby questioned the Defendant regarding the facts of the crime. After transporting the Defendant to the Domestic Violence Office for further questioning, Defendant was again advised of his Miranda rights and he signed a waiver of those rights. Defendant indicated he

understood his rights at that time. He did not request an attorney. Defendant's oral statement to the police was taped. In addition to the tape, Defendant wrote a handwritten account regarding the incident and his involvement. On the following day, Defendant was again advised of his rights and waived them. Billingsby recalled that there were no major contradictions between the following day's statement and that of the previous evening.

Billingsby smelled the odor of alcoholic beverages on the Defendant. In response to the trial court's questioning, Billingsby stated that the Defendant was not so intoxicated as to not understand what he was stating. While Billingsby believed that Defendant was intoxicated at the scene, he could not determine what level of intoxication Defendant was suffering from. While the Defendant was later more coherent in regards to questioning, Billingsby thought that he always understood what was being asked of him and understood his rights. In addition, Billingsby observed that Defendant's version of the events which occurred that night has not changed since his earliest statements at the scene.

Defendant testified that on September 24, 1994, he and the victim had finished two (2) half gallons of Wild Irish Rose wine. They were consuming the third when the stabbing occurred. Defendant recalled that the police came to his home that evening, but he did not recall what was said nor did he recall being advised of his rights. He did not remember being asked to sign a waiver of rights, although he admitted that the signature on the waiver of rights form was similar to his own signature. Defendant did recall sitting in a room with two (2) or three (3) police officers talking to him, but he could not remember what was discussed. Defendant recalled giving a statement to the police and signing a waiver of rights form on the

following day.  Defendant admitted he was an alcoholic and drank on a daily basis.

The trial court found that the statements were admissible as they were voluntarily made.  Any statements made prior to Defendant being given his Miranda warnings were spontaneous and were made prior to Defendant's being placed in custody.  The trial court noted that Miranda provides that warning requirements are not required if the defendant makes a spontaneous statement before police officers have investigated or targeted a suspect.  See Miranda, 384 U.S. at 478, 86 S. Ct. at 1630; State v. Brown, 664 S.W.2d 318 (Tenn. Crim. App. 1983), perm. to appeal denied (Tenn. 1984).

The trial court reasoned that the only issue was whether the Defendant was so intoxicated that he did not understand what he was doing to himself by making these incriminating statements or was incapable of understanding the Miranda warnings.  It found there was no testimony that Defendant was so intoxicated that he did not understand the warnings.

Considering the totality of the circumstances, the evidence shows that the Defendant was properly advised of his rights and had the capacity to understand those rights. While the Defendant's testimony is contradictory to that of the arresting officers, the trial court determined that the Defendant made a knowing, voluntary and intelligent waiver of his rights and accredited the testimony of the police officers. Intoxication does not render a defendant's confession invalid if the evidence shows that he was capable of understanding and waiving his rights. State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App.) perm. to appeal denied (Tenn. 1985). Even if Defendant were intoxicated at the time of the offense, Defendant made a similar

statement on September 25, 1995, which he is not seeking to suppress. The Defendant has failed to meet his burden. See Odom, 928 S.W.2d at 23. The trial court properly denied the Defendant's motion to suppress.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to support the finding that he killed the victim with premeditation and deliberation. When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict

approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

Mia Ambrose, the niece of the victim, Barbara Sue Oakley, testified that the victim was visiting in her home in Franklin during the month of August 1994. Prior to that time, Oakley had been living with Steve Smith for a period of one (1) year. Ambrose recalled that while Oakley was in her home, the Defendant called her home looking for Oakley. Oakley and the Defendant had previously resided together for ten (10) or twelve (12) years. After Oakley and the Defendant spoke, Oakley asked Ambrose to take her to the Defendant's home in Nashville. A few days later, Ambrose and her three (3) year old daughter returned to the Defendant's home to visit her aunt. While Ambrose was there, she noticed that Oakley and the Defendant were drinking heavily. When Oakley drank, Ambrose recalled that she was very happy. The Defendant repeatedly argued with Oakley regarding her activities, particularly regarding her relationship with Steve Smith. According to Ambrose, Defendant was planning to share an apartment in Nashville with Smith.

On one occasion, Ambrose and Oakley were talking about Oakley's plans to leave the Defendant and to return to live with Steve Smith. The Defendant walked in, having overheard the conversation, and said, "Oh, so you're thinking about leaving . . . I don't think so. It would be over my dead body. You know, I'd kill you first." The final day Ambrose was at Defendant's home, Oakley and Defendant were arguing and Defendant was throwing things at her. He grabbed a knife, pointed it at her neck and said he would kill her. Ambrose immediately decided to leave and begged her aunt to accompany her. A week later, Ambrose learned that Oakley had been stabbed by the Defendant.

Joann Leeper, mother of Steve Smith, kept in touch with Oakley after she and Smith ended their relationship. Oakley came to her home several times and called often. Leeper went to the Defendant's home to talk with Oakley because she was concerned that the Defendant might try to hurt her. While she was there, she met the Defendant. Oakley assured Leeper that she was alright. On the day of the stabbing in September, Oakley and Defendant came to Leeper's home. Oakley and Leeper were planning a trip to Columbia to see Smith. Oakley and the Defendant left Leeper's home to make some copies, and when they returned they both appeared to have been drinking. The Defendant appeared angry and agitated when Leeper and Oakley discussed their plans for visiting Smith the next day. Oakley was stabbed later that day after leaving Leeper's home.

Robert Spence, next door neighbor to the Defendant at 22 Waters Avenue, saw Oakley on September 24, 1994, around 4:00 p.m. Oakley was mowing Spence's grass while Spence was working on his car. The Defendant came over in Spence's yard and wanted the mower. When Oakley refused to give Defendant the mower, Defendant told her he would take her in the house and "whoop her ass." Oakley shrugged off the comment. Spence observed the couple fighting and arguing every day, with the Defendant constantly threatening Oakley. Defendant had threatened to kill Oakley and bragged that he had given her a black eye. Spence related that Oakley had a black eye every month.

Spence left his home at 5:45 p.m. on September 24, 1994 and returned at midnight. As he was driving up the road, he saw the crime scene tape all over the Defendant's home. When he pulled in his driveway, he noticed a horrible odor.

There was a trail of blood from their house to his house, all over his yard, porch, and door.

Curly Schmidt lives at 24 Waters Avenue, two (2) houses down from the Defendant. Prior to September 24, 1994, she did not know the Defendant or Oakley. On that date, she heard a knock on the door and when she opened it, a woman with blood all over her blouse stood there. She asked Schmidt to call 911. While Schmidt called 911, the woman entered her home and sat on the couch. She was still bleeding and looked sleepy. Schmidt stayed on the telephone until the ambulance arrived. No one appeared at Schmidt's home looking for the victim. Oakley told Schmidt who had stabbed her.

Officer Mark Chestnutt is a detective sergeant with the Metropolitan Police Department. During September 1994 he was sergeant over the Patrol Division for the lower East Nashville area. He responded to a call from the dispatcher that there had been a stabbing at McCarn Street from an incident of domestic violence. A later call stated that Oakley was at a location on Waters Street. When Chestnutt arrived, the ambulance personnel were already there and Oakley was sitting on the couch being treated for her injuries. After Oakley was placed in the ambulance, Chestnutt went to the McCarn address where the Defendant was in custody. He noticed the cut on Defendant's pinky finger, but when he was treated by Medcom it was not serious enough to require a trip to the hospital.

Officer David Howard responded to the call from 816 McCarn Avenue on September 24, 1994. Howard entered the back door and called out for the Defendant. Defendant was in the living room and it was dark, so Howard used his

flashlight and ordered Defendant to face away from him. The Defendant repeatedly stated that he stabbed Oakley. At one point, he blurted out, "I jammed it up her ass as far as I could." Howard put the Defendant in handcuffs and read him his <u>Miranda</u> rights, then asked him for the location of the weapon. The Defendant pointed to a knife in the floor in front of the refrigerator. The knife had a five (5) or six (6) inch blade. While the Defendant was laughing and appeared to have been drinking, he stated that he understood his rights. Howard observed the wound on Defendant's pinky finger and saw that it was a small cut. He also saw two (2) knives behind the kitchen sink that had recently been washed.

Detective David Imhoff was working in the patrol division on the date of the incident. He first received a call of a stabbing on McCarn Street and then a related call at Waters Avenue. When Imhoff arrived on the scene at Waters Avenue, Oakley was lying on a gurney being taken out of the house. Imhoff then walked over to McCarn Street where Officer Howard was holding the Defendant. Defendant was placed in Imhoff's patrol car, and then Imhoff got in his car and began to fill out an arrest report. Howard advised Imhoff that Defendant had been advised of his <u>Miranda</u> rights. While Imhoff filled out the report, Defendant stated, "I stabbed that goddamn son of a bitch. She tried to cut me and I took up for myself. I took the knife from her and I stuck it up her ass. I made a mistake. I did it. I'd die if it were fatal. She is a fat old bitch." Imhoff was not questioning the Defendant when he made that statement. Imhoff later removed him from his car and placed him in Detective Scott Billingsby's vehicle to be transported. Imhoff observed a small cut on Defendant's pinky finger. Imhoff went inside the Defendant's home and observed blood throughout the residence and a knife on the kitchen floor.

Scott Billingsby works as a detective in the Domestic Violence Division. He arrived on the scene at 7:23 p.m. As the lead investigator, he spoke with the officers already present and examined the house and the evidence. Billingsby noticed that at the kitchen table, a struggle had evidently taken place as there was sugar and a bag of chips strewn about on the floor. There was blood in the floor and a partially open silverware drawer with blood on it. A trail of blood led to the back door from the kitchen table, and another trail of blood led from the table through the den into the living room where the telephone was located. Two knives found near the kitchen sink appeared to have blood residue on them.

The Defendant was still on the scene and Billingsby was advised by Officer Howard that Defendant had previously been advised of his constitutional rights. The first thing the Defendant stated to Billingsby was, " Blow my goddamn brains out. I cut her. I stuck her." At that point, Billingsby began to question Defendant and Defendant told him there were two "cuttings" in the kitchen.

Billingsby removed Defendant from the scene and took him to the Department of Domestic Violence. Once they arrived at the unit, Billingsby again advised Defendant of his constitutional rights and then Defendant executed a written waiver acknowledging that he understood his rights. Throughout the night, Defendant became unclear regarding exactly where the stabbings occurred. Defendant was consistent during questioning that Oakley cut him and then he "stuck" her. Sometimes Defendant stated that he took the knife away from Oakley and "stuck" her with it, and at other times he stated that he obtained another knife and then "stuck" her. Tapes were made of Defendant's statements to the police, and these

-12-

tapes were played for the jury as evidence. Defendant also wrote a handwritten statement during the course of the questioning. The statement reads as follows:

> Me and my wife were in the kitchen as near as my recollection recalls. She cut me with a pearing [sic] knife and I took it away from her and stuck it in her gut. She immediately ran out the back door and I went and called 911 for emergency because I love my wife.
>
> Thank you!
> James Carl Nichols

The following day, Billingsby was notified that Oakley was not expected to live. The Homicide Unit was advised of the crime and Billingsby met with Detective David Miller who took over the investigation. He and Miller again spoke with the Defendant on September 25, 1994. Miller advised Defendant of his constitutional rights and Defendant agreed to talk with them. Defendant stated that he and Oakley were at the table when they became involved in an argument. Oakley cut him on the finger so he got up, walked into the kitchen to obtain a knife and then stuck her with the knife once. Throughout all the questioning, Defendant only recalled stabbing Oakley one (1) time.

Detective David Miller led the homicide investigation of Oakley's death. After being advised of the situation, Miller and Billingsby interviewed the Defendant. Defendant was advised of his constitutional rights and told the detectives that he had been home drinking that day. He was sitting at the kitchen table with Oakley when they got into an argument, although he could not be sure what the argument was about. Defendant got up from the table, went over to the drain rack, got a knife and stabbed her. Defendant also said his finger had been cut but was not sure if Oakley cut it or how it got cut.

Joe Minor, special agent for the Tennessee Bureau of Investigation and the Forensic Services Division, received blood samples from a knife involved in this case. Only one (1) knife found at the scene had enough blood from which to obtain a sample. A blood sample was also obtained from the Defendant. A DNA profile was done on the Defendant, and it was determined that the blood on the knife did not match the Defendant's.

Dr. William Miles was working in the emergency room when Oakley was brought into Vanderbilt Hospital. When she arrived, Oakley was combative and her blood pressure and oxygen levels were extremely low. Dr. Miles established I.V. lines and used a breathing tube and a mechanical ventilator to control her airway. In order to provide Oakley with the rapid introduction of fluids into her body that she needed in order to survive, he established a central venous line underneath her clavicle. While it was impossible to determine how much blood Oakley had lost by the time she arrived at the emergency room, it was obvious by her near death condition that she had lost a great deal of blood.

Oakley had three wounds. She had a several inch wound to her upper chest close to the left side of her collarbone which was through the muscle and into the chest cavity itself. She had two (2) wounds to her abdomen, both in the left quadrant of the belly. All three (3) wounds were stab wounds. In order to assess the severity of her chest wound, Dr. Miles inserted a chest tube to determine what bleeding had occurred within the chest wall. After she was stabilized to the point that she could be transported for surgery, she was taken to surgery to address the bleeding from the abdomen. Prior to surgery, given the amount of injuries and Oakley's degree of

obesity, Dr. Miles estimated a fifty (50) to seventy-five (75) percent chance that she would not survive.

During surgery, Dr. Miles found that the two (2) stab wounds to Oakley's abdomen were the most life-threatening. In addition to five (5) inches of Oakley's own body tissue, the stab wound had penetrated the diaphragm muscle, the stomach, and both the large and small intestines all the way through to the pancreas gland. It would require a great deal of force for the weapon to go to this depth through someone as large as Oakley. Dr. Miles stated that each of these three (3) wounds were potentially life threatening. Any time there are injuries of this degree to a person the size of Oakley, there is a high potential for an increase in mortality. He estimated her chances for survival after surgery at fifty (50) percent.

While Oakley's blood pressure and vital signs had stabilized, she was not in stable condition. She was monitored closely, particularly due to her low intake of oxygen. Shortly before 9:00 a.m. on September 25, 1994, Oakley became agitated and was thrashing about. She was given a sedative and was given more fluid. When her blood pressure dropped to an extremely low level, Dr. Miles was called to her bedside because she had turned blue. A needle was inserted into her chest and some fluid came back, so Dr. Miles made an incision to drain the fluid from her chest. Oakley's heart stopped beating. The fluid was present in her chest because the catheter inserted into her chest became dislodged. This dislodging is a recognized risk factor for this type of injury and this treatment. While Dr. Miles worked for a long period of time to revive Oakley, she suffered another cardiac arrest. As a result, even after being revived, she suffered severe brain damage due to the low level of oxygen to the brain. Oakley was, in fact, nearly brain dead. Even

with deep stimulation, she would barely move her head which was evidence of significant abnormal brain disfunction. Her prognosis was very grim and her family was notified. Her family determined that if her heart stopped, she was not to be revived. Oakley's heart rate and vital signs subsequently deteriorated and stopped.

Dr. Jesse Giles conducted the autopsy of Oakley on October 1, 1994. He summarized her anatomical diagnoses as three (3) penetrating stab wounds, severe obesity, no preexisting detected cardiovascular disease, and post acute exploratory chest and abdomen surgeries. He found the cause of death to be complications of stab wounds of the chest and the abdomen. He listed Oakley's obesity as a contributing factor. Oakley's blood loss, pancreas injury, decreased lung function to the left side, and high blood alcohol all set into motion the increased lack of oxygen to the brain. The complications were foreseeable risks for someone in her condition to encounter during the course of treatment. Dr. Giles determined the manner of death to be homicide.

The State rested its case-in-chief.

Dr. Mona Gretel Case Harlan testified that she reviewed the medical record of Oakley, including the autopsy report, the post-mortem photographs, the death certificate and the emergency medical service and hospital records. Following her review of all the records, Dr. Harlan concluded that even though Oakley had additional risk factors for being prone to serious injury and death from stab wounds due to her obesity and alcohol abuse, she did not die as a result of obvious complications from the wounds such as infection, blood loss, or blood clots. Instead, she died as a result of a brain injury from the low oxygen to the brain caused by a

dislodged chest tube. Dr. Harlan stated that this was not an expected complication of having a right subclavian catheter inserted, but that it can happen. While the doctors did find the dislodged catheter, the catheter was dislodged for too long a period of time. Ultimately, Dr. Harlan found that she died as a complication of the treatment of the stab wounds, a complication caused by the hospital.

The Defendant testified that he was living with his mother and Oakley in September 1994. On September 24, 1994, he and Oakley awoke and went to a church rummage sale. On the way home, Oakley drove to the liquor store to get a drink. The Defendant resisted but eventually agreed and bought a half gallon of wine. They went home and drank the wine while they worked around the house and Oakley mowed the front yard of their next door neighbor, Robert Spence. Ms. Leeper called and asked them to take some papers to the drug store and make photocopies, so they drove to her home and then went to the drug store . When they left the drug store, he and Oakley bought another half gallon of wine at the liquor store. They dropped off the papers and returned home around 2:00 p.m. They drank the wine at home, then returned to the liquor store for another half gallon of Wild Irish Rose.

They were sitting at home at the kitchen table drinking wine and talking when Oakley asked Defendant to borrow $50.00 from his boss. Defendant refused and they began to argue. Oakley became angry, picked up a knife off the table and cut the Defendant's hand. When that occurred, he grabbed her by the wrist and she started to dig the knife into the back of his wrist. He got out of his chair and Oakley grabbed the front of his shirt. The Defendant panicked and grabbed another knife lying on the counter. He stuck her with the knife, cutting her across the shoulder,

-17-

so that she would let go of him. Oakley dropped her knife and threw her hands up in the air, then the Defendant stepped away and dropped his knife to the floor. Defendant ran to the bedroom and called for an ambulance. After he called 911, he went back into the kitchen to look for Oakley and she was gone. He looked outside for her and then waited for the police to arrive.

The Defendant could not remember what he said specifically to the police after they got to the scene or during their questioning that night because he "was pretty drunk." He recalled being in the police car and going to Vanderbilt Hospital to get stitches in his finger. Defendant could not remember what actually occurred that night until he sobered up the next day, September 25, 1994, around 1:00 p.m. when he again talked to the police.

Ruby Bird, the Defendant's mother, was living with her son at 816 McCarn Street in September 1994. She was away visiting a friend at the time the stabbings occurred because the Defendant and Oakley were getting drunk earlier that day. Bird was afraid of Oakley when she drank. Six (6) weeks prior to the stabbing of Oakley, Bird called the police because the Defendant was drunk and made threats toward his mother. During cross-examination, Bird denied telling the police that the Defendant had threatened to shoot his wife. However, she did admit that Defendant had threatened to "eliminate" her [Bird] for running her mouth.

The Defendant contends that the evidence does not establish the elements of premeditation and deliberation required to support the verdict for first degree murder. At the time of the offense, first degree murder was "an intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-

202(a)(1)(1991 Supp.). "Premeditation" is "an act done after the exercise of reflection and judgment," meaning the "intent to kill must have been formed prior to the act itself." Id. at (d). The purpose to kill need not pre-exist in the defendant's mind for any definite period of time. Id. In addition, the defendant's mental state must be carefully considered to determine if the defendant was "sufficiently free from excitement and passion as to be capable of premeditation." Id.

"Deliberation" requires some period of reflection such that the mind is free from the influence of excitement or passion. State v. Brown, 836 S.W.2d 530 (Tenn. 1992). Also, deliberation requires that the killing be done with a "cool purpose," meaning the defendant is free from the passions of the moment. State v. West, 844 S.W.2d 144 (Tenn. 1992). Both the elements of premeditation and deliberation are jury questions which may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. to appeal denied (Tenn. 1994). Repeated blows may serve as circumstantial evidence of murder in the first degree if such blows are inflicted as the result of premeditation and deliberation, and not in the heat of passion. Brown, 836 S.W.2d at 542.

There was ample evidence in this case to support the jury's finding of premeditation and deliberation. Reviewed in the light most favorable to the State, the evidence in this case reflected that the Defendant and Oakley had a violent history. Robert Spence testified that the Defendant often threatened Oakley and that she suffered a black eye every month. Mia Ambrose, Oakley's niece, testified that in the week prior to Oakley's death, she had heard the Defendant threaten to kill Oakley and saw him put a knife to her throat. The Defendant's mother had also filed a police report in which she advised the police that the Defendant had threatened

-19-

the life of Oakley and herself. Declarations by a defendant of his intent to kill Oakley may be indicative of both premeditation and deliberation. Brown, 836 S.W.2d at 541-42. The Defendant's constant threats and abusive conduct towards Oakley is a fact of their prior relationship from which motive may be inferred by the jury to prove premeditation and deliberation. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App., perm. to appeal denied (Tenn. 1995).

The Defendant testified at trial that he and Oakley were having an argument when she cut his pinky finger. He got up, walked away from the table towards the sink, retrieved a knife from the drawer, walked back over to the table and then stabbed Oakley three (3) times. Dr. Miles testified that a great deal of force must have been used to produce injuries of this type upon a woman the size of Oakley. The fact that the Defendant procured the knife he used to inflict the stab wounds upon Oakley is a circumstance from which the jury could have reasonably inferred premeditation and deliberation. Brown, 836 S.W.2d at 541. There is not a specific amount of time required to form deliberation. Gentry, 881 S.W.2d at 3-4. The jury could reasonably have inferred from the Defendant's actions that Defendant was acting with premeditation, pursuant to his previous threats, and with deliberation, having sufficient time to contemplate the consequences of his actions while he walked over to the drawer to retrieve the knife and having a cool purpose when he returned to the table and stabbed Oakley violently three (3) times. Any reconciliation in conflicts between the testimony of the Defendant at trial and his prior statements to the police is a matter entrusted exclusively to the trier of fact and not this court. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); Byrge v. State, 575 S.W.2d 292 (Tenn. Crim. App. 1978).

As no one was at home other than the Defendant, it may be inferred that the Defendant was the one who washed the knives he used to inflict the stab wounds. Defendant's actions of washing the knives, while not necessarily proof of premeditation and deliberation, discredited his theory of self-defense as set forth in his statements to the police and his testimony to the jury. See West, 844 S.W.2d at 148. The jury is entitled to reject the Defendant's theory in favor of the State's proof. See State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Defendant subsequently argues that he did not have the mental capacity to form the required intent to kill Oakley due to his intoxication. Other than the testimony of the Defendant, the record is devoid of any proof that the Defendant was intoxicated to the point to negate any specific intent. While some police officers testified that Defendant had obviously been drinking, they also stated that he was coherent and capable of understanding his actions at the scene of the stabbing. The defense of intoxication negating specific intent is a question of fact for the jury. State v. Givens, 631 S.W.2d 720, 721 (Tenn. Crim. App., perm. to appeal denied (Tenn. 1982). The jury's findings stand and accredit the testimony of the arresting officers rather than that of the Defendant. Having found that there were sufficient facts to prove the elements of first degree murder, this issue is without merit.

III. ADMISSION OF PRIOR BAD ACTS OF THE DEFENDANT

The Defendant argues that the trial court erred in allowing the admission of prior threats by the Defendant against Oakley. Specifically, the Defendant objected to the testimony of Mia Ambrose regarding the Defendant's threats to kill Oakley if she left him while pointing a knife at her throat. He also objected to the testimony

-21-

of their next-door neighbor, Robert Spence, who testified that Defendant repeatedly threatened and abused Oakley, even as late as the day of the stabbing when Defendant told Oakley that he would take her in the house and "whoop her ass." Defendant further objects to the trial court's assistance to the State during the hearing determining the admissibility of the testimony of Spence. Over the objections of defense counsel, the trial court ruled such testimony admissible as evidence of other crimes, wrongs or acts under Rule 404(b) of the Tennessee Rules of Evidence. Even if the testimony was admissible under Rule 404(b), Defendant contends that the probative value of such evidence is outweighed by the danger of unfair prejudice.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, in the exceptional case another crime may arguably be relevant to an issue other than the accused's character. Id., Advisory Commission Comments; citing State v. Parton, 694 S.W.2d 299 (Tenn. 1985). Issues such as identity, motive and common scheme or plan, intent or rebuttal of accident or mistake are such exceptional cases. Id. Three (3) conditions must be satisfied before allowing such evidence:

> 1) The court upon request must hold a hearing outside the jury's presence;
>
> 2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> 3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1), (2) and (3).

Upon objection by the Defendant, the trial court held a hearing outside the presence of the jury regarding the testimony of Mia Ambrose as to prior threats the Defendant made towards Oakley. Following the hearing, the trial court determined that such testimony was admissible on the basis that "as [it] understood the rules of evidence, this is admissible." As the trial court failed to determine and state on the record the material issue to which the issue was relevant and failed to find that the probative value of the evidence was not outweighed by the danger of unfair prejudice, our determination of the admissibility of the evidence will be based upon the evidence presented at the jury out hearing. State v. DuBose, 953 S.W.2d 649, 653 (Tenn. 1997).

Evidence must be relevant and probative to some issue at trial and must "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. During the jury out hearing, Mia Ambrose testified that while she stayed in the Defendant's home, she witnessed incidents during which the Defendant threatened to kill Oakley because she was planning to leave him. Also, Ambrose testified that Defendant pointed a knife at Oakley and said he was going to kill her. These threats occurred approximately one and a half weeks prior to the stabbing. For the jury to convict the Defendant of first degree murder, the State was required to prove intent, premeditation and deliberation. These threats go both to the Defendant's intent and motive as relevant to establish material issues. Violent acts indicative of the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show intent. State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993). Furthermore, while such evidence

-23-

may have been prejudicial, the evidence was highly relevant to material issues and did not introduce any extraneous issues to the jury. Dubose, 953 S.W.2d at 655. On the basis of this record, the prejudice was not unfair and this court concludes that the probative value of Ambrose's testimony was not outweighed by the danger of unfair prejudice.

The testimony of Robert Spence in which he stated that Defendant threatened Oakley on the day of the stabbing and repeatedly abused and threatened Oakley prior to that occasion was also determined admissible by the trial court following a jury out hearing. Because the trial court complied with the requirements of Rule 404(b), our standard of review is abuse of discretion. Dubose, 953 S.W.2d at 652. Similar to our reasoning above, these threats are admissible to prove the Defendant's motive and intent for proof of the elements of deliberation and premeditation. Furthermore, the evidence was not unfairly prejudicial and was probative of material issues. This issue is without merit.

Defendant argues the trial court improperly assisted the State in admitting the testimony of Robert Spence which violated his right to a fair trial. Defendant did not object at trial during the jury out hearing. Failure to make a contemporaneous objection waives consideration by this court of the issue on appeal. See Tenn. R. App. P. 36(a); Teague v. State, 772 S.W.2d 915, 926 (Tenn. Crim. App. 1988), perm. to appeal denied. (Tenn. 1989); State v. Killebrew; 760 S.W.2d 228, 235 (Tenn. Crim. App.), perm. to appeal denied. (Tenn. 1988). In addition, the Defendant failed to include this issue in his motion for new trial. Therefore, this issue has been waived. Tenn. R. App. P. 3(e); see State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App.), perm. to appeal denied. (Tenn. 1988). Even if the issue were

not waived, we fail to see from our review of the record that the Defendant was prejudiced due to the trial court's questioning of a witness during a jury out hearing.

IV. JURY INSTRUCTIONS

In his second issue, Defendant claims the trial court erred in denying his motions (1) for an amended instruction on the range of punishment and (2) to strike the portion of the range of punishment instruction which advises the jury of the minimum length of time the Defendant would serve prior to parole eligibility. Defendant argues this potion of the instruction is unconstitutional. The following instruction was given to the jury:

> The punishment for the offense is life imprisonment, life imprisonment without the possibility of parole or death by electrocution. The State, however, is not seeking the death penalty or life imprisonment without the possibility of parole and, therefore, should you return a verdict of guilty the Court will impose a life sentence.
>
> The jury will not attempt to fix any sentence. However, you may weigh and consider the meaning of a sentence of imprisonment.
>
> You are further informed that the minimum number of years a person sentenced to imprisonment must serve for this offense before reaching the earliest release eligibility date is 25 years.
>
> Whether a defendant is actually released from incarceration on the date when first eligible for release is a discretionary decision made by the Board of Paroles and is based on many factors. The Board of Paroles has the authority to require a defendant to serve the entire sentence imposed by the Court.

The trial court gave similar instructions on all lesser included offenses, including their earliest release eligibility dates.

Defendant's trial counsel filed a motion to charge the jury on the range of punishment and a motion to exclude an instruction on parole eligibility as required by Tennessee Code Annotated section 40-35-201. The trial court overruled the Defendant's motion regarding the exclusion of that information but granted the

-26-

motion on charging the jury on range of punishment. While Defendant now claims this instruction was unconstitutional and violated his due process rights, we decline to find that the trial court erred. The statute does not violate the doctrine of separation of powers nor does it deprive the Defendant of his right to a fair trial pursuant to his right of due process, therefore, the statute is constitutional under the circumstances of this case. State v. Howard E. King, No. 02-S-01-9703-CR-00021, ___ S.W.2d ___ , slip op. at 2, Shelby County (Tenn., Jackson, July 6, 1998).

Similar to the defendant in King, Defendant relies upon Farris v. State, 535 S.W.2d 608 (Tenn. 1976), in arguing that this statute is unconstitutionally vague. In Farris, the instruction given "provided no reasonable guidance as to the ramifications of the parole system." King, No. 02-S-01-9703-CR-0002, slip op. at 10. Conversely, the statute in question here does not leave the jury to speculate about the benefits of the parole system, but requires the Department of Correction to compute exact figures to determine the application of various factors relevant to release eligibility. Id. Jurors are provided with "explicit, objective, and unambiguous guidance sufficient to overcome any allegation of vagueness." Id. at 11.

Also, the Defendant contends that the instruction violated his rights to a fair trial by an impartial jury based upon a misleading and inaccurate portion of the jury instructions. Similar to the defendant in King, the Defendant in the case sub judice compares jury instructions charged to his jury on sentencing to those jury instructions in State v. Cook, 816 S.W.2d 322 (Tenn. 1991). The jury instructions given on the range of punishment in Cook were not proper as the jury was only instructed on Range I punishment when the defendant was actually subject to punishment as a Range II offender. King, No. 02-S-01-9703-CR-00021, slip op. at

13. Defendant's jury instructions in the case <u>sub</u> <u>judice</u> informed the jury as to the shortest and longest possible sentences for each offense charged to the jury. Additionally, the jury was instructed as to the minimum portion that Defendant would serve before becoming eligible for parole. The jury in this case was properly instructed as to the requirements of the statute. <u>Id</u>. Under the circumstances of this case and the jury instructions given under Tennessee Code Annotated section 40-35-201(b)(2), the Defendant was not deprived of his due process right to a fair trial. <u>Id</u>. at 17.

Finally, the Defendant claims that the statute in question is invalid based upon <u>Farris</u> as an exercise by the legislature in judicial authority. As our supreme court has noted, "[H]aving already acknowledged the authority of the legislature to provide a range of punishment instruction, we must also acknowledge that an explanation of the reality of early release and parole is no further an encroachment into the judicial function." <u>King</u>, No. 02-S-01-9703-CR-00021, slip op. at 8. As the jury must decide the issue of guilt or innocence and the trial court must determine the ultimate sentence, Tennessee Code Annotated section 40-35-201(b)(2) does not violate the Separation of Powers Clauses of the Tennessee Constitution. <u>Id</u>.

We affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, Judge

CONCUR:

-28-

_____
GARY R. WADE, Presiding Judge


_____
L. T. LAFFERTY, Special Judge